UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

LYNN A. KANE,

        Plaintiff,

    -against-                       **COMPLAINT**

CARMEL CENTRAL SCHOOL DISTRICT, JAMES
M. RYAN, Ed.D., Superintendent of Schools, sued in    **JURY TRIAL DEMANDED**
his professional and individual capacity, ANDY IRVIN,
Asst. Superintendent for Instruction and Personnel, sued in
his professional and individual capacity, and JOSEPH
PHILLIPS, District Director, sued in his professional and
individual capacity,

              Defendants.
-----------------------------------------------------------------X

## INTRODUCTION

      Plaintiff Lynn A. Kane, a qualified person with a disability, brings this lawsuit

pursuant to §504 of the Rehabilitation Act, codified at 29 U.S.C. §701 *et seq.*, Title I of the

Americans With Disabilities Act, 42 U.S.C. 12101 *et seq.*, Title II of the Americans With

Disabilities Act, 42 U.S.C. 12132 *et seq.,* and the New York Human Rights Law, NY Exec. Law

§296 *et seq.*, alleging discrimination in the terms and conditions of her employment on account

of her disability.

## PARTIES

1.    Plaintiff Lynn A. Kane is afflicted with Multiple Sclerosis.  She resides in the

       Town of Wappingers Falls, Dutchess County, within this judicial district.

2.    Defendant Carmel Central School District is a municipal entity, organized

       pursuant to the laws of the New York State, and doing business in the Town of

       Carmel, Putnam County, within this judicial district.  Defendant school district

may sue and be sued.

3. Defendant James M. Ryan, Ed.D. at all times relevant to this lawsuit, is the Superintendent of Schools of defendant school district. He is sued herein in both his professional and individual capacity.

4. Defendant Andy (*sic*) Irvin, at all times relevant to this lawsuit, is the Assistant Superintendent for Instruction and Personnel of defendant school district. He is sued herein in both his professional and individual capacity.

5. Defendant Joseph Phillips, at all times relevant to this lawsuit, is the District Director of defendant school district and plaintiff's direct supervisor. He is sued herein in both his professional and individual capacity.

JURISDICTION AND VENUE

6. As all events occurred within the County of Putnam, venue is properly found in this district.

7. Plaintiff timely filed two Notices of Claim upon defendant school district.

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(3) & (4) and 28 U.S.C.§1367.

9. Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission. Fewer than ninety days have elapsed since Plaintiff received her Notice of Right to Sue.

FACTS

10. Plaintiff is a New York State certified Music Teacher.

11. Since 2002, plaintiff has been employed by defendant Carmel Central School

2

District (CCSD) as a music teacher and orchestra director.

12. Plaintiff teaches orchestra and symphonic music to high school students at Carmel High School. In addition, she was appointed producer of the high school musical by the CCSD Board of Education (BOE).

13. During her entire career at CCSD high school, plaintiff has never received any negative evaluation. Nor has her competence or ability to perform her job ever been questioned.

14. In 1998, plaintiff was diagnosed as suffering from Multiple Sclerosis, a chronic neurological disorder affecting muscle function, vision, digestive function, speech and other bodily functions. Symptoms may be mild, such as numbness in the limbs, or severe, such as paralysis or loss of vision.

15. When first diagnosed, plaintiff's symptoms were mild and she did not require any assistance in order to walk.

16. However, since November 2010, plaintiff's ability to walk became more limited and requires at least the use of a walker, and usually a scooter, to ambulate. Because walking is a major life activity and plaintiff's ability to walk is substantially impaired, she is a qualified person with a disability pursuant to the Rehabilitation Act and the Americans With Disabilities Act.

17. After her ability to walk became substantially impaired, plaintiff did not initially request any accommodation from her employer.

18. However, after plaintiff began to use a walker, in November 2010, defendants began to discriminate against her and created a hostile work environment for her

3

on account of her disability.

19. Plaintiff's work site is in an outbuilding that houses the Music Department and the Alternative High School. It is across a large, steeply sloping parking lot from the main high school building.

20. In December 2010, plaintiff's direct supervisor, Joseph Philips, told her to get an "electric wheelchair" because he claimed that it took her too long to walk from her building to the main building for meetings.

21. Phillips also complained that it took plaintiff too long to get to the restroom because of her disability.

22. Philips repeatedly demanded that plaintiff obtain an electric wheelchair in front of her colleagues, causing her acute embarrassment and public humiliation, even after she requested that he stop.

23. At her own expense, plaintiff purchased a Go-Go Scooter Ultra X to satisfy Philips's repeated demands.

24. On January 26, 2011, plaintiff observed that the parking lot where her car was parked was coated with ice. She called several administrators to ask someone to move the car but could not locate anyone to help her. Using her walker to access her car, plaintiff fell on ice and needed assistance from a passing stranger to get up. She observed several teachers in the Music Department laughing at her plight.

25. Rob McKiernan, the Dean of Students, told plaintiff that she should have asked for help to avoid this "fiasco."

26. On January 31, 2011, the high school principal, Kevin Carroll, assisted plaintiff in

4

unloading her scooter from her car and parking it.  Thereafter, plaintiff hired a car

service to drive her to and from school and assist her, *inter alia*, in loading and

unloading her scooter.

27. On February 3, 2011, the Assistant Superintendent for Instruction and Personnel,

Andy Irvin told plaintiff that the district could not accommodate her special needs

and was not willing to "handicap" the building.

28. That day, Irvin also told plaintiff that the district was putting her out of work on

paid leave, pending a medical examination.

29. On February 8, 2011, the BOE voted to order plaintiff to obtain a comprehensive

medical examination pursuant to §913 of the NY Education Law.

30. However, the district did not arrange for this examination to take place until April

20, 2011, when plaintiff was examined by Kishore Ranade, MD, a neurologist.

31. After his examination, Dr. Ranade issued a report, dated April 21, 2011, which

stated, in part, "The patient states she does not really need to use her legs in order

to conduct her duties as a music teacher.  Assuming this is true, her current spastic

paraparesis from multiple sclerosis should not interfere with her ability to conduct

an orchestra."

32. Dr. Ranade also recommended that plaintiff receive a neuropsychological

evaluation to explore her executive and cognitive status and recommended Dr.

David Shumsky, a neuropsychologist, to conduct this evaluation.

33. Defendants made no arrangement to pay Dr. Ranade, who improperly billed

plaintiff's health insurance policy and then billed plaintiff for the co-payment.

34. Thereafter, for the balance of the 2010-2011 school year, defendants did not notify plaintiff to report for any further evaluation nor  that she could return to work.

35. Defendants did not make any attempt to conduct an interactive process with plaintiff to determine whether she needed any accommodations to continue working.

36. In or about late May 2010, plaintiff received notification of her annual salary for the next school year, 2011-2012, which she signed and returned as directed before June 10, 2011.

37. On July 29, 2011, defendant Ryan sent plaintiff a letter directing her to make an appointment by August 5, 2011 with Dr. Shumsky, to be evaluated "on or before August 30, 2011."

38. When plaintiff called Dr. Shumsky on August 3, 2011, he stated that he had no knowledge of the district's request for an evaluation and told her that, in any case, he would not be available until September 2011 at the earliest.

39. Dr. Shumsky also told plaintiff that his evaluations consumed approximately fifteen hours and were conducted over a period of two months.  Therefore, even if he were available in August, it would be impossible to complete this evaluation on defendants' timetable.

40. Dr. Shumsky also told plaintiff that this evaluation typically cost approximately $5,000.00 and that the school district had made no arrangement to pay his fee.

41. On August 5, 2011, by and through her attorney, plaintiff wrote to defendant Ryan to advise him of the results of her contact with Dr. Shumsky.

6

42. Plaintiff received no response to this letter.

43. On Friday, August 12, 2011, plaintiff called Carmel High School to inquire about
freshman orientation and did not receive any call back.

44. On Monday, August 15, 2011, plaintiff again called the high school and spoke
with principal Carroll, who told her that he was not sure whether she was still a
faculty member at the high school.

45. On Wednesday, August 17, 2011, assistant principal Wendy Gentile called
plaintiff and told her to contact the head of Technical Services to reset her
password, thereby enabling her to see her class lists. Gentile also told plaintiff that
orientation was on September 1, 2011.

46. After some difficulty, plaintiff was finally able to access her class lists the
following day, August 18, 2011.  She learned that she had been assigned to teach
two classes of guitar instruction each day.

47. As plaintiff does not play guitar or even own a guitar, this assignment appeared
designed to make it more difficult for her to resume her teaching duties.

48. Plaintiff thereupon called principal Carroll, who advised her that it was his
understanding that, because she had not completed an evaluation with Dr.
Shumsky, she could not return to her job.

49. Plaintiff next contacted her union representative, Moriah Olsen, and through her
good offices, met with Irvin and presented him with a list of accommodations she
needed.

50. These requested accommodations included, *inter alia*, certain modifications to

plaintiff's building access, provision of a teacher's aide, and internal modifications to enable plaintiff to have a raised platform from which to teach and conduct the orchestra. Plaintiff also asked for modifications to the bathroom she used. In addition, plaintiff requested that she be allowed to participate in faculty meetings via phone conferencing.

51. Defendants operate a physical plant that provides no accommodation to persons with ambulatory disabilities, including students, faculty, staff and the general public.

52. Carmel High School was originally built in the early 1900's and has been expanded several times since it was built. It is a multi-story building whose elevators are often out of order. The Teacher Center, including teachers' mailboxes, are in the main building and is inaccessible to plaintiff because of stairs. Despite the fact that it is a public building, this school is largely inaccessible to persons with ambulatory disabilities.

53. Although the Teacher Center is often inaccessible to plaintiff, until the 20011-12 school year, defendants refused to allow an aide to retrieve her mail.

54. Access to the public areas of defendants' high school is limited by stairs at the front and side entrances. Other entrances that have no stairs are often locked. There are no handicapped-accessible ramps or other devices to enable persons in wheelchairs or scooters to access the main building.

55. Handicapped-accessible ramps were installed a number of years ago to accommodate a wheelchair-bound student but were dismantled and removed

when the student left the high school.

56. Defendants' high school is a multi-story building with elevators.  As the building
is old, the elevators are frequently out of order.

57. The work site to which plaintiff is assigned contains a single entrance with no
stairs.  However, this entrance has a lip that is inaccessible for a scooter or
wheelchair, as well as a steep incline that is dangerous in icy conditions.

58. Moreover, the emergency exit in plaintiff's classroom, which she must use during
a fire drill or an actual emergency, has two large steps that plaintiff is unable to
navigate with her scooter.

59. As a result of plaintiff's meeting with Olsen and Irvin, defendants provided a
teacher's aide to plaintiff and arranged for a dedicated parking place for her car.

60. Defendants failed to make any physical modifications to either the buildings'
access and egress or any interior modifications that would enable plaintiff to
properly perform her job.

61. As a consequence of defendants' refusal to make adequate modifications in the
building, plaintiff was unable to use the bathroom when needed and was forced to
forego food and drink during the day so as to limit her bathroom needs.  As a
result, she began to suffer physically from food and water deprivation and
required increased medication.

62. In addition, because plaintiff was forced to conduct from a seated position below
her students, she suffered injury to her shoulders and arms.

63. Throughout the 2011-2012 school year, defendant Phillips made hostile and

denigrating remarks to or about plaintiff, further increasing her discomfort and humiliation. For example, he told several of plaintiff's former students that she was dead. He also told plaintiff, when she received a floral bouquet from her students, that lilies are for dead people.

64. By removing plaintiff from her position, failing to accommodate her disability, including failing to retrofit its physical plant to accommodate persons with ambulatory disabilities, and creating a hostile work environment, defendants violated the Americans With Disabilities Act, §504 of the Rehabilitation Act and the New York Human Rights Law.

65. As a result of defendants' illegal misconduct, plaintiff has suffered physical injury and pain, professional humiliation, isolation from her peers, and severe emotional distress.

CLAIMS

66. Plaintiff repeats and realleges all the allegations contained in paragraphs 1-65 herein.

67. Defendant School District violated the Americans With Disabilities Act, §504 of the Rehabilitation Act and the New York Human Rights Law when it operated public buildings without any accommodations for persons with ambulatory disabilities.

68. Defendants violated the Americans With Disabilities Act, §504 of the Rehabilitation Act and the New York Human Rights Law when they failed to provide plaintiff with reasonable accommodation of her disabilities to enable her

10

to properly and safely perform her job.

69. Defendants violated the Americans With Disabilities Act, §504 of the
Rehabilitation Act and the New York Human Rights Law when they treated her
with hostility and removed her from work on account of her disability.

70. As a result of defendants' illegal misconduct, plaintiff has suffered physical injury
and pain, loss of professional standing, public humiliation, isolation from her
peers and other severe emotional and physical distress.

WHEREFORE, plaintiff prays that this Honorable Court:

1. Accept jurisdiction over this action;

2. Empanel a jury to fairly hear and decide this action;

3. Award to plaintiff compensatory damages for pain and suffering and front pay;

4. Award to plaintiff punitive damages for the wanton violation of her civil rights in
violation of the Americans with Disabilities Act;

5. Award plaintiff the reasonable attorneys' fees and costs expended in litigating this
action; and

6. Order any such other relief deemed just and proper.

Dated:     July 11, 2012

Respectfully submitted,

S/

HELEN G. ULLRICH

BERGSTEIN & ULLRICH, LLP

11

15 Railroad Avenue
Chester, New York 10918
(845) 469-1277
*Counsel for plaintiff*